## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-02938-NYW-SBP

JASIN MCGUIRE,

      Plaintiff,

v.

CARMAX BUSINESS SERVICES LLC,
EXPERIAN INFORMATION SOLUTIONS, INC., and
EQUIFAX INFORMATION SERVICES LLC,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Susan Prose, United States Magistrate Judge**

      This matter comes before the court on two motions seeking to compel arbitration: one filed by Defendant CarMax Business Services LLC ("CarMax"), ECF No. 14, and the second filed by Defendant Experian Information Solutions, Inc. ("EIS" or "Experian"), ECF No. 18. CarMax and EIS argue that, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA"), the court (1) should compel pro se Plaintiff Jasin McGuire to arbitrate all claims that he raises against them in this case and (2) should stay this matter pending the completion of the arbitrations. The undersigned considers the Motions pursuant to the Order Referring Case (ECF No. 29), the Order referring the Motions (ECF No. 30), and 28 U.S.C. § 636(b)(1)(B). The court has reviewed the Motions and related briefing, the entire case file, and the applicable law. For the reasons discussed below, the court respectfully **RECOMMENDS** that the Motions be

**granted** and this action be **administratively closed** pursuant to D.C.COLO.LCivR 41.2.[1]

**BACKGROUND[2]**

Mr. McGuire brings claims against CarMax and EIS for violations of various provisions of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"). ECF No. 1 ¶¶ 114-159. Two arbitration provisions bear on the court's assessment of the motions to compel arbitration.

## I.    Arbitration Provision in a CarMax Retail Installment Contract

On February 24, 2022, Mr. McGuire entered into a Retail Installment Contract ("RIC") with CarMax to purchase a 2019 Jeep Cherokee. *See* ECF No. 14-1, Declaration of Meryl Roper, Senior Corporate Counsel of CarMax, ¶ 3 & Ex. A; *see also* Compl. ¶ 27 ("Plaintiff procured a loan from CarMax in February 2022"). In the RIC, Mr. McGuire financed $41,998.32 to be paid in 72 payments totaling $583.31 each. ECF No. 14-1 at 3.[3] He initialed the first three pages of the RIC, representing that he had "read and agree[d] to all provisions on all pages," *id.* at 3-5, and then signed an attestation on the final page of the RIC that included the following language:

This Contract has 4 pages, plus any optional [Guaranteed Asset Protection] Waiver

---

[1] There is "a division among courts over whether motions to compel arbitration are dispositive for purposes of Magistrate Judge jurisdiction." *Hartsfield v. Frontier Airlines, Inc.*, No. 23-cv-02093-RMR-KAS, 2024 WL 3027972, at *1 n.3 (D. Colo. June 14, 2024) (citing *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1140-41 (D. Colo. 2012) (collecting cases and noting that "courts are divided on whether motions to compel arbitration are dispositive for purposes of 28 U.S.C. § 636(b)(1)")), *recommendation adopted*, 2024 WL 3611430 (D. Colo. July 1, 2024), *appeal filed*, No. 24-1305 (10th Cir. July 31, 2024). Like the court in *Hartsfield*, this court takes the cautious approach and issues a recommendation on the instant motions to compel arbitration.

[2] The court takes the following facts from Mr. McGuire's complaint, ECF No. 1, and the evidence submitted in connection with the motions to compel arbitration. *See, e.g.*, *Petrie v. GoSmith, Inc.*, 360 F. Supp. 3d 1159, 1161 (D. Colo. 2019).

[3] The court cites to the page numbers generated by the court's Case Management/Electronic Case Files system.

Agreement. This is Page 4. By signing below you represent that you have read and agree to all provisions on all pages, **including the Arbitration Provision on Page 3 of this Contract**.

*Id.* at 6 (emphasis added). As pertinent here, the Arbitration Provision in the RIC states:

This Arbitration Provision describes when and how a Claim (defined below) shall be arbitrated. Arbitration is a way of resolving disputes before one or more neutral persons, instead of having a trial in court before a judge and/or jury. **By signing this Contract, you and we agree to be bound by the terms of this Arbitration Provision.**
. . .
**IF YOU OR WE CHOOSE ARBITRATION, THEN ARBITRATION SHALL BE MANDATORY, AND:**
**• ANY CLAIM WILL BE DECIDED BY ARBITRATION AND NOT IN COURT OR BY A JURY TRIAL.**
**. . .**
**a. What Claims are Covered.** A "Claim" is any claim, dispute or controversy between you and us that in any way arises from or relates to this consumer credit sale, the purchase you are financing by way of this Contract, the Vehicle and related goods and services that are the subject of the purchase and this Contract, or the collection or servicing of this Contract, including but not limited to:
• Initial claims, counterclaims, cross-claims and third-party claims;
• Disputes based on contract, tort, consumer rights, fraud and other intentional torts (at law or in equity, including any claim for injunctive or declaratory relief);
• Disputes based on constitutional grounds or on laws, regulations, ordinances or similar provisions; and
• Disputes about the validity, enforceability, arbitrability or scope of this Arbitration Provision or this Contract, subject to paragraph (f) of this Arbitration Provision.[4]

*Id.* at 5 (emphasis in original).

CarMax represents that Mr. McGuire made only one payment under the RIC on April 8, 2022. ECF No. 14 at 2. Mr. McGuire does not appear to dispute that point, but he claims that the

---

[4] Paragraph (f) contains a class action waiver that does not apply here. ECF No. 14-1 at 5.

reason for non-payment was that the Jeep was stolen just one month after he purchased it—a "twist of fate," as he describes it. Compl. ¶ 28; *see also* ECF No. 17 at 3 (describing the "total loss" of the vehicle). Mr. McGuire submits an email from Turo, apparently the insurer of the vehicle, which discusses "settlement information" for a claim Mr. McGuire apparently made on the Jeep. ECF No. 17-1. A Turo representative directed Mr. McGuire to "reply to this email with [his] lien holder's information," *id.*, but Mr. McGuire has not placed that email in the record and CarMax denies that it received any insurance proceeds or any recovery from a repossession and sale of the vehicle. ECF No. 14 at 2. A somewhat murky aspect of the story involves a separate CarMax loan to Mr. McGuire's son and CarMax's supposed conflation of the two loans (Mr. McGuire's and his son's), resulting in an "unexpected" credit to his son's account in the amount of $26,619.10 in about June 2022. ECF No. 17 at 4. CarMax ultimately closed the son's account and marked it "Paid in Full." *Id.* Mr. McGuire doesn't say whether his son notified CarMax of this mistake or whether his son retained this erroneous payment.

Whatever the truth of the matter concerning Mr. McGuire's reasons for nonpayment under the RIC—and this court need not resolve those questions here—Mr. McGuire asserts that his credit was subsequently compromised. At some point, CarMax reported the loan as a "charge-off" to various credit-reporting agencies, including EIS, which allegedly resulted in "significant hardships to Mr. McGuire," including "a tarnished credit reputation. Compl. ¶¶ 30-33, 35, 116 & *passim*.

## II.     Arbitration Agreement With EIS

To explain its argument that arbitration of this dispute is compelled, EIS has submitted evidence detailing its relationship with various affiliates, which is necessary to recount here in

some detail.

EIS is an affiliate of ConsumerInfo.com, Inc. ("CIC"). Declaration of Dan Smith, CIC Director of Product Operations, ECF No. 18-1 at 3 ¶ 2. CIC also does business as Experian Consumer Services ("ECS"). *Id.* at 2 ¶ 1. CIC/ECS and EIS are wholly-owned subsidiaries of Experian Holdings, Inc., and their parent company is Experian plc. *Id.* at 2 ¶ 2. CIC/ECS provides a credit-monitoring membership service called "CreditWorks." *Id.* at 2 ¶ 1.

On December 27, 2022, before this litigation commenced, Mr. McGuire enrolled in CreditWorks. *Id.* at 2 ¶ 3. Mr. McGuire had to complete a webform to enroll in CreditWorks. *Id.* The webform required Mr. McGuire to enter his personal information, including his name, address, phone number, and email address. *Id.* & Smith Decl. Ex. 1, ECF No. 18-1 at 7. After entering that information, Mr. McGuire had to click the "Create Your Account" button on the webform to enroll. *Id.* The following disclosure was immediately below the boxes for entering his email address and password: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy." *Id.* The phrase "Terms of Use Agreement" in the disclosure was hyperlinked and offset in blue text. *Id.* at 2 ¶ 4. Before clicking the "Create Your Account" button, Mr. McGuire could have viewed the entire text of the Terms of Use Agreement by clicking on the blue "Terms of Use Agreement" hyperlink. *Id.* If Mr. McGuire had clicked on that hyperlink, an additional window would have opened within his web browser that contained the entire text of the Terms of Use Agreement. *Id.* A large purple button reading "Create Your Account" was immediately below the disclosure. *Id.* The webform, disclosure, and the "Create Your Account" button appeared on a single webpage. *Id.* Smith Decl. Ex. 1.

5

After entering his information, Mr. McGuire clicked the "Create Your Account" button, thereby accepting and agreeing to the Terms of Use Agreement. *Id.* at 4 ¶ 5. Mr. McGuire would not have been able to enroll successfully in CreditWorks unless he clicked that button. *Id.* Mr. McGuire maintained a paid CreditWorks membership for one year, for which he paid $24.99 per month. ECF No. 36-1, Smith Reply Decl. at 2 ¶ 2. On December 20, 2023, Mr. McGuire cancelled his paid benefits, which automatically reverted him to a free CreditWorks membership. *Id.*

The Terms of Use Agreement in effect when Mr. Smith enrolled in CreditWorks is attached as Exhibit 2 to the Smith Declaration. *Id.* at 4 ¶ 5 & Smith Decl. Ex. 3. The Terms of Use Agreement in effect when Mr. McGuire filed this action is attached as Exhibit 3 to the Smith Declaration. *Id.* Every version of the Terms of Use Agreement that was in effect during Mr. McGuire's enrollment in CreditWorks contains an Arbitration Agreement that requires a party to arbitrate all claims against "ECS" that "relate to" or "arise out of" membership in CreditWorks:

> ECS and you agree to arbitrate all disputes and claims between us arising out of or relating to this Agreement to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law. The agreement to arbitrate includes, but is not limited to:
>
> claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this agreement.

*Id.* at 4 ¶ 6 & Smith Decl. Ex. 2, ECF No. 18-1 at 14. The Arbitration Agreement in the Terms of

Use Agreement revised October 13, 2023, which was in effect when Mr. McGuire filed this

lawsuit, similarly stated that "ECS and you agree to arbitrate all disputes and claims between us

that arise out of or relate to this Agreement[.]" Smith Decl. Ex. 3, ECF No. 18-1 at 46. The

Arbitration Agreement in this version of the Terms of Use Agreement specifically referenced

claims under the FCRA as being subject to binding arbitration. *Id.* at 47. The Arbitration

Agreement and the Overview and Acceptance of Terms section of the Terms of Use Agreement

define "ECS" to include its "affiliates." *Id.* at 4 ¶ 6; *see also id.* Ex. 2, ECF No. 18-1 at 14 ("For

purposes of this arbitration provision, references to 'ECS,' 'you,' and 'us' shall include our

respective parent entities, subsidiaries, affiliates (including, without limitation, our service

providers) . . ."); Ex. 3, ECF No. 18-1 at 45 ("The term 'ECS' means ConsumerInfo.com, Inc.,

an Experian® company (also known as Experian Consumer Services), . . . its predecessors in

interest, successors and assigns, affiliates (including, but not limited to, Experian Information

Solutions, Inc."). EIS has been an affiliate of ECS during the entire time Mr. McGuire has been

enrolled in CreditWorks. *Id.* at 4, ¶ 6.

      Every version of the Terms of Use Agreement in effect during Mr. McGuire's enrollment

in CreditWorks has a section entitled "Amendments" that advised Mr. McGuire he would be

bound by the then-current version of the agreement each time he "order[ed], access[ed], or

use[d]" any of the services or websites described in the agreement. *Id.* at 5 ¶ 7; Ex. 2, ECF No.

18-1 at 11-12; Ex. 3, ECF No. 18-1 at 46.

      During the period relevant to this litigation, EIS contributed to the services that

CreditWorks subscribers received by providing regular access to how information appears in

their EIS credit files, including changes to the information in those files. *Id.* at 5 ¶ 8. All
CreditWorks subscribers are required under the FCRA to provide written authorization to obtain
their credit reports or credit scores from EIS on a recurring basis through CreditWorks. *Id.* The
Terms of Use Agreement covers the provision of "Services," and that term is defined to include
services to which EIS contributed as the provider of credit information, including CreditWorks,
and providing "credit report(s), credit risk score(s), credit monitoring, credit score monitoring
and credit score tracking (including all the data and information contained therein), the receipt of
any alerts notifying [consumers] of changes to the information contained in [their] credit
report(s)[.]" *Id.*; Ex. 2, ECF No. 18-1 at 12-13; Ex. 3, ECF No. 18-1 at 45.

**III.    The Motions to Compel Arbitration**

On November 7, 2023, Mr. McGuire initiated this action against CarMax, EIS, and
Equifax Information Services LLC.[5] ECF No. 1. On December 4, 2023, CarMax filed its motion
to compel arbitration, arguing that Mr. McGuire is bound by the terms of the Arbitration
Provision in the EIS Contract. ECF No. 14. Similarly, EIS argues in its motion that Mr. McGuire
is contractually bound to arbitrate the claims he raises against EIS. ECF No. 18. Mr. McGuire
responded to both motions to compel, ECF No. 17 (CarMax Motion); ECF No. 26 (EIS Motion),
and the moving parties filed replies. ECF No. 19 (CarMax); ECF No. 36 (EIS).

The court analyzes each motion to compel, in turn, and concludes that both should be
granted and the disputes between the parties resolved by an arbitrator.

---

[5] Equifax has answered the complaint. ECF No. 25.

## ANALYSIS

### I.    Legal Standards Governing Arbitrability

The FAA "reflect[s] both a liberal federal policy favoring arbitration and the fundamental

principle that arbitration is a matter of contract." *Sanchez v. Nitro-Lift Techs., LLC*, 762 F.3d

1139, 1145 (10th Cir. 2014) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339

(2011)). Accordingly, courts "must rigorously enforce arbitration agreements according to their

terms," *Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013) (quotation and

citation omitted), and resolve "any doubts concerning the scope of arbitrable issues" in favor of

arbitration. *Sanchez*, 762 F.3d at 1146 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr.

Corp.*, 460 U.S. 1, 24-25 (1983)). "In addition, this liberal policy covers more than simply the

substantive scope of the arbitration clause, and encompasses an expectation that [arbitration]

procedures will be binding." *P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 866 (10th Cir.

1999) (internal quotation marks and quotation omitted).

"A court addressing a motion to compel arbitration . . . must first determine whether there

exists an enforceable agreement to arbitrate." *Brayman v. KeyPoint Gov't Solutions, Inc.*, 83

F.4th 823, 832 (10th Cir. 2023) (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S.

287, 299-300 (2010) (disputes over the formation of an arbitration agreement are "matters . . .

'the court must resolve'"); *Rent-A-Center v. Jackson*, 561 U.S. 63, 71 (2010)). Then, the court

proceeds "to determine such matters as 'who is bound by' the agreement, *Arthur Andersen LLP

v. Carlisle*, 556 U.S. 624, 630 . . . (2009), and whether the 'agreement covers a particular

controversy,' *Rent-A-Center*, 561 U.S. at 69 . . . ." *Id.* (citing *Belnap v. Iasis Healthcare*, 844

F.3d 1272, 1280 (10th Cir. 2017)); *see also Cavlovic v. J.C. Penney Corp., Inc.*, 884 F.3d 1051,

1057 (10th Cir. 2018) (after determining that there is a valid agreement to arbitrate, the second

step requires a court to determine whether the allegations in the complaint are within the scope of

the arbitration provision).

However, at this second step of the process—before the court determines whether a

particular issue is subject to arbitration—it may be obliged to decide the "gateway question" of

whether issues of arbitrability must be decided by the arbitrator rather than the court. *Brayman*,

83 F.4th at 832. Because arbitration is a matter of contract, 'parties can agree to arbitrate

arbitrability.'" *Id.* (quoting *Belnap*, 844 F.3d at 1280). There is a presumption, however, "that the

parties intend courts, not arbitrators,' to decide such issues." *Id.* (quoting *BG Grp., PLC v.

Republic of Argentina*, 572 U.S. 25, 34 (2014)). And so a court should "not decide that the

parties have delegated arbitrability issues to the arbitrator 'unless there is clear and unmistakable

evidence that they did so.'" *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938,

944 (1995) (brackets and internal quotation marks omitted); *AT&T Techs., Inc. v. Commc'ns

Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide

otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court,

not the arbitrator."). If the parties in fact delegated arbitrability issues to the arbitrator, "a court

possesses no power to decide the arbitrability issue. That is true even if the court thinks that the

argument that the arbitration agreement applies to a particular dispute is wholly groundless."

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019).

In deciding a motion to compel arbitration, the court applies a framework similar to that it

would utilize in deciding a motion for summary judgment: a motion to compel arbitration should

only be granted "if there are no genuine issues of material fact regarding the parties' agreement"

to arbitrate. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012) (quotation

omitted). Because the legal framework for deciding a motion to compel arbitration is similar to

summary judgment practice, the court may consider evidence presented by the parties. *See, e.g.*,

*Petrie v. GoSmith, Inc.*, 360 F. Supp. 3d 1159, 1161 (D. Colo. 2019). "The district court, when

considering a motion to compel arbitration which is opposed on the ground that no agreement to

arbitrate has been made by the parties, should give to the opposing party the benefit of all

reasonable doubts and inferences that may arise." *Vernon v. Qwest Comm. Int'l, Inc.*, 857 F.

Supp. 2d 1135, 1149 (D. Colo. 2012) (quoting omitted), *order aff'd*, 925 F. Supp. 2d 1185 (D.

Colo. 2013); *see also BOSC, Inc. v. Bd. of Cnty. Comm'rs of Cnty. of Bernalillo*, 853 F.3d 1165,

1177 (10th Cir. 2017) (explaining that a court must view the facts in the light most favorable to

the party opposing arbitration).

Once the court concludes that a valid arbitration agreement exists, and that the dispute

falls within the scope of the agreement, the FAA mandates a stay of a judicial proceeding. 9

U.S.C. § 3 (the court, "upon being satisfied that the issue involved in such suit or proceeding is

referable to arbitration under such an agreement, shall on application of one of the parties stay

the trial of the action until such arbitration has been had"); *see also Nichols v. Google LLC*, No.

23-cv-01022-RMR-NRN, 2023 WL 5938917, at *2 (D. Colo. Sept. 12, 2023), *report and

recommendation adopted*, No. 23-cv-01022-RMR-NRN, 2023 WL 9232937 (D. Colo. Oct. 11,

2023).

## II.    CarMax's Motion to Compel Arbitration

At issue here is the Arbitration Provision in the RIC between Mr. McGuire and CarMax.

For the reasons that follow, the court finds that the Arbitration Provision is a valid and

enforceable arbitration agreement and that the dispute between the parties must be determined by an arbitrator.

### A.    Enforceable Agreement to Arbitrate

The court turns first to the question of "whether there exists an enforceable agreement to arbitrate," *Brayman*, 83 F.4th at 832, which is a matter the court must resolve. *Granite Rock Co.*, 561 U.S. at 299-300. In assessing this question, the court "should apply ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (internal quotation marks omitted).

The RIC explicitly states that "federal law and the law of the State of Colorado apply to this Contract." ECF No. 14-1 at 4. Under Colorado law, "when the arbitrability decision is originally submitted to the court, rather than the arbitrator, the court's initial task 'is to determine whether the agreement contains a valid and binding [arbitration] clause using traditional principles of contract interpretation.'" *Johnson-Linzy v. Conifer Care Communities A, LLC*, 469 P.3d 537, 547 (Colo. App. 2020) (quoting *City & Cnty. of Denver v. Dist. Court*, 939 P.2d 1353, 1363 (Colo. 1997)). In making this assessment, courts "will enforce the agreement as written unless there is an ambiguity in the language; courts should neither rewrite the agreement nor limit its effect by a strained construction. Thus, like any contract, an arbitration agreement must be given effect according to the plain and ordinary meaning of its terms." *Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003) (internal citation omitted).

Here, the plain language of the Arbitration Provision "is not reasonably susceptible on its face to more than one interpretation." *See id.* There is no hint of ambiguity in its language.

Rather, the Provision unequivocally, and repeatedly, emphasizes Mr. McGuire's specific assent

to the proposition that any disputes between CarMax and him will be arbitrated:

> **By signing this Contract, you and we agree to be bound by the terms of this Arbitration Provision.**
> . . .
> **IF YOU OR WE CHOOSE ARBITRATION, THEN ARBITRATION SHALL BE MANDATORY, AND:**
> **• ANY CLAIM WILL BE DECIDED BY ARBITRATION AND NOT IN COURT OR BY A JURY TRIAL.**

ECF No. 14-1 at 5, Arbitration Provision (emphasis in original). The evidence here demonstrates

that Mr. McGuire manifested his assent to the Arbitration Provision twice: first, when he

initialed the page containing the Provision—representing that he had "read and agree[d] to all

provisions on all pages," *id.* at 5—and then again when he signed the attestation on the final page

of the RIC, agreeing to "**the Arbitration Provision on Page 3 of this Contract**." *Id.* at 6

(emphasis in original); *see also Vernon*, 857 F. Supp. 2d at 1149 (in determining whether a

contract exists, "'evidence of the parties' conduct, their oral statements and their writings, and

other evidence illuminating the circumstances surrounding the making of an agreement are

admissible to clarify the intent and purpose of the parties'") (quoting *I.M.A., Inc. v. Rocky

Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986)).

Mr. McGuire points to no specific ambiguity on this record, and to reiterate, this court

discerns none. Rather, the intent of the parties to submit to arbitration is manifested by the plain

terms of the Arbitration Provision, coupled with Mr. McGuire's affirmative written acceptance

of them. And if Mr. McGuire harbored some "uncommunicated, subjective intent" to resist the

Arbitration Provision, that is insufficient to rebut his "objective manifestation of assent" readily

apparent on the record here. *See id.* (citing *Avemco Insurance Co. v. N. Colo. Air Charter, Inc.*,

38 P.3d 555, 559 (Colo. 2002)).

Therefore, considering the totality of the undisputed evidence before the court, CarMax has met its burden to show the existence of a valid arbitration agreement. Mr. McGuire has not met his burden to demonstrate a genuine issue of material fact as to the enforceability of the arbitration agreement. Indeed, he does not dispute the contents of the RIC—including the numerous explicit iterations of the arbitration requirement contained in that contract—or that he indicated his agreement to arbitration by initialing and signing the document in multiple places. In short, nothing in the record calls into question the validity and enforceability of the Arbitration Provision.

### B.    Arbitrability of the Dispute

#### 1.    Delegation of Arbitrability

Having concluded that the Arbitration Provision is a valid and enforceable contract under Colorado law, the next step in the arbitration assessment is to decide whether the Provision covers the controversy between the parties. *See Rent-A-Center*, 561 U.S. at 69. But preliminarily, the court must resolve "the gateway question of who—the court or the arbitrator—decides" whether Mr. McGuire's FCRA claims fall within the scope of the Provision and are subject to arbitration. *See Brayman*, 83 F.4th at 832.

This critical threshold question is accorded a passing reference in CarMax's briefing. CarMax asserts that the Arbitration Provision "define[s] the scope of arbitral issues to include, *inter alia*, '***Disputes about the*** validity, *enforceability,* ***arbitrability****, or scope* **of this Arbitration Provision** or this Contract . . ." ECF No. 14 at 8 (emphasis added); *see also* ECF No. 14-1 at 5, Arbitration Provision ¶ (a). But then CarMax proceeds to argue that the Arbitration Provision is

sufficiently broad to cover the FCRA claims that Mr. McGuire raises here, *see* ECF No. 14 at 8-10, suggesting that it is for this court to decide the scope question. There is a tension between CarMax's lip service to the threshold issue and the focus of its briefing. Nevertheless, this court must refrain from "usurping the role of the arbitrator," *Brayman*, 83 F.4th at 833, and so it must first directly address the gateway question. As the Tenth Circuit made clear in *Belnap*:

> Given that parties can agree to arbitrate arbitrability, as well as other issues, questions of arbitrability encompass two types of disputes: (1) disputes about *whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement; and (2) threshold disputes about *who should have the primary power to decide* whether a dispute is arbitrable . . . . Importantly, courts must address the second type of dispute first. In other words, the question of *who* should decide arbitrability precedes the question of *whether* a dispute is arbitrable.

844 F.3d at 1280-81 (internal quotation marks and citations omitted) (emphasis in original).

The starting point for answering the question of "*who* should decide arbitrability" begins with the language of the Arbitration Provision itself, which—as CarMax noted, albeit briefly—explicitly places that decision in the hands of the arbitrator. ECF No. 14-1 at 5, Arbitration Provision ¶ (a) (placing in the category of "What Claims are Covered" any "disputes about the validity, enforceability, arbitrability or scope of this Arbitration provision or this Contract"); *see also Naizgi v. HSS, Inc.*, 685 F. Supp. 3d 1015, 1020 (D. Colo. 2023) ("The question of who has the power to decide arbitrability depends upon what the parties have decided.") (citing *First Options*). Under well-settled principles of contract interpretation, "[t]he words of the contract should be given their plain meaning according to common usage, and strained constructions should be avoided." *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002) (internal citations omitted); *see also Prof'l Solutions Ins. Co. v. Mohrlang*, No. 07-cv-02481-PAB-KLM, 2009 WL

321706, at *8 (D. Colo. Feb. 10, 2009) (in interpreting contracts, "courts are to give effect to the intent and reasonable expectations of the parties and to enforce the [contract's] plain language unless it is ambiguous") (citing *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007)).

Here, the Arbitration Provision manifests the parties' clear intent to delegate issues of arbitrability to the arbitrator, and Mr. McGuire has not challenged the delegation provision specifically. "The Supreme Court has held that 'when parties agree that an arbitrator should decide arbitrability, they delegate to an arbitrator *all threshold questions* concerning arbitrability[.]" *Naizgi*, 685 F. Supp. 3d at 1020 (quoting *Belnap*, 844 F.3d at 1280) (emphasis added). Thus, here, it is for the arbitrator to decide whether Mr. McGuire's FCRA claims fall within the scope of the Arbitration Provision, and to address the merits of his arguments against enforcement of the Provision, including on unconscionability grounds. *See Frazier v. W. Union Co.*, 377 F. Supp. 3d 1248, 1267-68 (D. Colo. 2019) (holding that plaintiff's unconscionability arguments challenging validity of arbitration clause were for the arbitrator to decide).

Put simply, paragraph (a) in the Arbitration Provision "is 'clear and unmistakable evidence' that the parties intended an arbitrator to decide whether the agreement applies and the dispute is arbitrable." *Brayman*, 83 F.4th at 833 (quoting *First Options*, 514 U.S. at 944). The Arbitration Provision gives the arbitrator, and not the courts, "the exclusive authority to resolve disputes about the applicability of the agreement[.]" *Id.* at 836. For this reason alone, arbitration is compelled. However, if the Honorable Nina Y. Wang, the presiding judge in this matter, resolves the gateway issue differently, the court alternatively proceeds to address the question of the arbitrability of Mr. McGuire's FCRA claims under the Arbitration Provision—an issue on

which CarMax has presented extensive argument. ECF No. 14 at 8-10. If Judge Wang reaches the scope question, Carmax's Motion to Compel should still be granted.

## 2.    Scope of the Arbitration Provision

The court has concluded that the Arbitration Provision is a valid and enforceable contract under Colorado law that authorizes a moving party the right to compel arbitration. Proceeding on the assumption that this court (rather than the arbitrator) may decide whether a dispute is arbitrable, the court next considers whether Mr. McGuire's FCRA claims fall within the scope of the Arbitration Provision and must be decided by the arbitrator. *See Cavlovic*, 884 F.3d at 1057. For the reasons set forth below, this court respectfully answers that question in the affirmative.

The Arbitration Provision broadly covers "any claim, dispute or controversy . . . that in *any way arises from or relates to* this consumer credit sale[.]" ECF No. 14-1 at 5 (emphasis added). Recall that the presumption of arbitrability is "particularly applicable" to a broad arbitration clause such as this. *AT&T Techs.*, 475 U.S. at 650; *see also Allen*, 71 P.3d at 378 (recognizing that "a broad or unrestricted arbitration clause makes the strong presumption favoring arbitration apply with even greater force") (internal quotation marks and citation omitted). Here, Mr. McGuire's claims under the FCRA clearly "arise[] from or relate[] to" the financing of his purchase of the 2019 Jeep Cherokee through the RIC, and the FCRA claims further raise a "dispute[] based on" both "consumer rights . . . and laws . . . ." ECF No. 14-1 at 5, Arbitration Provision ¶ (a). Mr. McGuire does not argue that there are any legal constraints foreclosing arbitration of FCRA claims as a general matter, nor is this court aware of any such restrictions. *See, e.g.*, *Davis v. Ally Fin'l Inc.*, No. 23-22897 (RMB-MJS), 2024 WL 2239144, at *3 (D.N.J. May 17, 2024) (finding that lawsuit raising FCRA claims was "clearly covered" by

17

the "broad arbitration clause" in a RIC) (citing *Jacobowitz v. Experian Info. Sols., Inc.*, No. 19-20120, 2021 WL 651160, at *4 (D.N.J. Feb. 19, 2021) (compelling arbitration of FCRA claim and finding that compelling arbitration of that claim would not be unconscionable)).[6] Under these circumstances, this court could not logically say "with positive assurance that the [Arbitration Provision] is not susceptible of an interpretation that covers the asserted dispute." *See AT&T Techs.*, 475 U.S. at 650.

The court has carefully considered Mr. McGuire's counter-arguments and is unpersuaded by them. His pitch to evade the Arbitration Provision is that it would be inequitable for the court to enforce the provision because CarMax has engaged in "misappropriation." *See* ECF No. 17 at 4-5 (arguing that CarMax credited an insurance payment for McGuire's allegedly stolen vehicle to his son's separate CarMax account, and "urg[ing] the Court to recognize the procedural and substantive injustices at play and to rule against the enforcement of the arbitration agreement, allowing for a thorough judicial review of this case"). But if the crux of the matter is CarMax's alleged "misappropriation," that constitutes tortious conduct which also falls squarely within the

---

[6] *Accord, e.g.*, *Nykoriak v. Experian Info. Sols., LLC*, No. 21-CV-12227, 2022 WL 4455548, at *4 (E.D. Mich. Sept. 23, 2022) (Even if plaintiff "had attempted to argue FCRA claims are non-arbitrable, such assertions would be unavailing. Such a contention would overlook the reality that courts across the country have enforced arbitration clauses in connection with claims brought under the Fair Credit Reporting Act.") (cleaned up); *Burton v. Equifax Info. Servs., LLC*, No. 1:21-CV-00233-DCLC-SKL, 2021 WL 5500773, at *3 (E.D. Tenn. Nov. 22, 2021) ("[C]ourts within the Sixth Circuit have held that FCRA claims are arbitrable."); *McMahan v. Byrider Sales of Indiana S, LLC*, No. 3:17-CV-00064-GNS, 2017 WL 4077013, at *4 (W.D. Ky. Sept. 14, 2017) ("There is no indication that Congress intended to preclude the arbitration of FCRA claims and courts have held that such claims are arbitrable.") (collecting cases); *Ostreicher v. TransUnion, LLC*, No. 19-CV-8174 (KMK), 2020 WL 3414633, at *9 (S.D.N.Y. June 22, 2020) ("With respect to the FCRA, district courts within the Second Circuit regularly compel arbitration of such claims.") (collecting cases).

scope of the Arbitration Provision.[7] ECF No. 14-1 at 5 (Arbitration Provision encompasses

disputes based on contract and tort, including "fraud or other intentional torts"); *see also*

*Sticky.io, Inc. v. Martingale Software, LLC*, No. 21-cv-00664-RM-STV, 2022 WL 1061911, at

*1 (D. Colo. Apr. 8, 2022) (recognizing that "[m]isappropriation, interference with business

relationships, and fraud are torts"). Like Mr. McGuire's FCRA claims, any tort claim (which he

has not pleaded in this case) would be subject to arbitration.

    Mr. McGuire next argues that he cannot be compelled to arbitrate because CarMax failed

to comply with the notice requirement in the Arbitration Provision. ECF No. 17 at 8-9; *see also*

ECF No. 14-1 at 5, Arbitration Provision ¶ (b) ("Either you or we may require any Claim to be

arbitrated by first sending to the other party, by certified mail, a written notice of dispute[.]").

However, Mr. McGuire misapprehends the clear intent of the notice requirement; it was he, the

party *raising* the dispute, who was obliged to provide notice to CarMax—not the other way

around. Because Mr. McGuire circumvented the Arbitration Provision altogether by filing this

lawsuit, CarMax's first opportunity to point to the arbitration mandate was by means of the

instant motion to compel arbitration. And so it is Mr. McGuire, not CarMax, who has "fail[ed] to

follow contractual procedures." *See* ECF No. 17 at 8.

    Mr. McGuire further asserts that the Arbitration Provision cannot be enforced because it

is procedurally and substantively unconscionable. ECF No. 17 at 9-11. His procedural argument

focuses on the supposed "absence of meaningful choice" about the contract, ECF No. 17 at 10,

and he contends that the Provision is substantively unconscionable because it has compelled him

---

[7] This court expresses no opinion on the merits questions of whether the tort of misappropriation
may be cognizable in this context and, if so, whether CarMax engaged in tortious conduct.

to forego certain remedies under the Colorado Consumer Protection Act. *See id.* Neither

argument is persuasive.

The Colorado Supreme Court has established a multi-factor test to determine whether a

contract is procedurally and substantively unconscionable. The factors to be considered are: (1) a

standardized agreement executed by parties of unequal bargaining power, (2) lack of opportunity

to read or become familiar with the document before signing it, (3) use of fine print in the

portion of the contract containing the challenged provision, (4) absence of evidence that the

provision was commercially reasonable or should have reasonably been anticipated, (5) the terms

of the contract, including substantive unfairness, (6) the relationship of the parties, including

considerations of assent, unfair surprise, and notice, and (7) all the circumstances surrounding

the formation of the contract, including its commercial setting, purpose, and effect. *Davis v.

M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986). It is Mr. McGuire's burden, as the party

challenging arbitration, to persuade the court that the contract is unconscionable. *Weller v. HSBC

Mortg. Servs., Inc.*, 971 F. Supp. 2d 1072, 1080 (D. Colo. 2013) (burden is on the party opposing

arbitration to establish unconscionability). He has failed to do so.

The court begins by recognizing that "arbitration of disputes is generally not

unconscionable, and in fact is encouraged by Congress." *Spain v. Johnson*, No. 23-cv-00419-

DDD-MEH, --- F. Supp. 3d ---, 2024 WL 907435, at *4 (D. Colo. Jan. 16, 2024) (citing 9 U.S.C.

§ 2). In *Spain*, the court found that even though Lyft's terms of service "are a standardized form,

the terms were readily available to [plaintiff], the use of arbitration is common and not

unreasonable (in fact it is encouraged by Congress), and the mass nature of Lyft's service means

that tens of thousands of other customers are able to review the same terms. The circumstances

here simply don't support the idea that this provision was snuck in or forced upon an unsuspecting or unsophisticated customer with no other options." *Id.* (citing *Davis*, 712 P.2d at 991).

Application of the *Davis* factors compels the same result here. While the Arbitration Provision is a standardized form, it was readily available to Mr. McGuire—and, certainly, large numbers of other CarMax clients—for review. Notably, "the use of arbitration is common and not unreasonable" in a situation like this, "where tens of thousands of other consumers are able to review the same terms." *Spain*, 2024 WL 907435, at *3 (rejecting argument of unconscionability in a terms of service contract for Lyft). Mr. McGuire denies a "proper opportunity for review," ECF No. 17 at 10, but nothing in the record indicates that he was forced into a "take-it-or-leave-it" position and compelled to immediately buy the vehicle, or that any CarMax official prevented him from taking the time he needed to review the four-page RIC. The print in the Arbitration Provision is the same size as the rest of the RIC, is not especially small, and is legible. And Mr. McGuire points to no evidence that the Arbitration Provision is commercially unreasonable or that a purchaser should not have reasonably anticipated that a large corporation in the business of selling and financing vehicles would not include a standard arbitration requirement in its contracts. Neither is there anything on the face of the Arbitration Provision suggesting any substantive unfairness or an intention to catch the consumer unawares; rather, the language provides clear notice that arbitration will be required to resolve almost every potential dispute between the parties.

Finally, the record here evinces no circumstances surrounding the formation of the contract that would implicate other concerns, including Mr. McGuire's contention that the

Arbitration Provision obliges him to forego a remedy under the Colorado Consumer Protection
Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101 *et seq.*, including attorney's fees. *See* ECF No. 17 at
11. He has not raised a CCPA claim in this action, but even if he had, nothing in the Arbitration
Provision prohibits the assertion of a statutory right under the CCPA or bars the mediator from
awarding attorney's fees in accordance with that statute. *See* ECF No. 14-1 at 5 ¶ (e) ("Each
party must pay the expense of that party's attorneys . . . regardless of which party prevails in the
arbitration, *unless applicable law . . . provide[s] otherwise*.") (emphasis added).

At bottom, Mr. McGuire has failed to show that the Arbitration Agreement is
unconscionable or otherwise unenforceable. He obviously prefers to litigate his claims in this
court, but that preference does not render an arbitration agreement unconscionable. *See Spain*,
2024 WL 907435, at *4 (citing *Bekele v. Lyft, Inc.*, 918 F.3d 181 (1st Cir. 2019)). Accordingly,
the court finds that the unconscionability argument does not prevent the enforcement of the
arbitration agreement in the RIC. Because the dispute Mr. McGuire raises falls within the scope
of the Arbitration Provision, he should be compelled to arbitrate his claims against CarMax. The
court therefore respectfully **RECOMMENDS** that CarMax's Motion to Compel Arbitration be
**granted**.

### III.    EIS's Motion to Compel Arbitration

EIS seeks to compel arbitration of Mr. McGuire's claims in this FCRA dispute on
grounds that (1) the parties have entered into the Arbitration Agreement, a valid agreement to
arbitrate Mr. McGuire's claims; (2) EIS is authorized to enforce the Arbitration Agreement; and
(3) issues of arbitrability have been delegated to the arbitrator under the Arbitration Agreement.
EIS Motion at 14-20. As EIS explains in its Motion, these arguments have been resolved in its

favor in more than twenty cases in federal district courts across the country. *Id.* at 7-8 (listing

twenty-three cases in which EIS prevailed). Based on this court's research, since EIS filed its

Motion, other courts have agreed with EIS and resolved in its favor identical issues to those in

the instant case. *See, e.g.*, *George v. Experian Info. Sols.*, No. 23-cv-02303-LKG, 2024 WL

3013146, at *9 (D. Md. June 14, 2024) (in a case involving the identical Arbitration Agreement

contained in the CreditWorks Terms of Use, concluding that "Plaintiff must pursue all claims

against EIS in this FCRA matter, including any threshold issues regarding the scope of the

arbitration agreement and whether EIS may enforce that agreement, before the arbitrator").

The record here provides no reason for this court to diverge from the well-reasoned

holdings of its many sister courts. For the reasons that follow, this court respectfully

recommends that this matter be compelled to arbitration.

A.    **EIS's Evidence in Support of the Motion to Compel**

As a preliminary matter, the court must address Mr. McGuire's arguments seeking to

undermine the evidence presented by EIS: specifically, the declaration of CIC Director of

Product Operations Dan Smith and the documents attached to Mr. Smith's declaration. *See* ECF

No. 18-1.

Liberally construing Mr. McGuire's response and giving it the maximum possible credit,[8]

Mr. McGuire contends that Mr. Smith lacks personal knowledge of the facts set forth in his

declaration and the documents attached to the declaration. In other words, this court should

---

[8] Mr. McGuire's argument is somewhat hard to make out, given that he focuses on a declaration
submitted by a person named David Williams, a declarant for EIS in another case brought in a
different court. *See* ECF No. 26 at 3-7.

23

refuse to consider this evidence in deciding the Motion to Compel. The court has carefully

considered the matter and sees it quite differently.

A "declaration used to support or oppose a motion must be made on personal knowledge,

set out facts that would be admissible in evidence, and show that the . . . declarant is competent

to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Further, "[a] witness may testify to a

matter only if evidence is introduced sufficient to support a finding that the witness has personal

knowledge of the matter." Fed. R. Evid. 602. "Personal knowledge may be proved by a witness's

or a declarant's own testimony, or reasonably inferred from his position or the nature of his

participation in the matters to which he swears." *Johnson v. Sw. Recovery Servs. Inc.*, No. 3:22-

CV-242-X-BH, 2023 WL 1944127, at *3 (N.D. Tex. Jan. 24, 2023), *report and recommendation

adopted*, 2023 WL 1879999 (N.D. Tex. Feb. 10, 2023).

Mr. Smith declares—and there is nothing in the record to contradict his statements—that

he has personal knowledge directly relevant to the arbitration question before this court. He

derives that personal knowledge from many sources. He is the Director of Product Operations for

CIC, is charged with supporting CIC's online sign-up process for CreditWorks, and is able to

verify that Mr. McGuire enrolled in CreditWorks on December 27, 2022, based upon Mr.

Smith's review of CIC membership enrollment data maintained in its regular course of business.

ECF No. 18-1 at 2-3, ¶¶ 1, 3. And Mr. Smith has explained, under penalty of perjury, that he is

personally familiar with the process for establishing a CreditWorks account through the CIC

website. *Id.* at 3-4 ¶¶ 4-6. The webform required for Mr. McGuire to enroll in CreditWorks, and

the Terms of Use governing his membership, fall within the categories of documents of which

Mr. Smith has personal knowledge. *Id.* at 3-4 ¶¶ 4-6; *see also* Background § B., above, & ECF

No. 18-1 at 2-3 ¶ 1 (detailing Mr. Smith's history with CIC, his job duties, and his acquisition of

knowledge "in the course and scope of [his] job responsibilities and through the review of

pertinent documents maintained as business records by CIC in the course and scope of CIC's

business, including Experian's internal records that store CreditWorks account information").

    Mr. Smith's statements on these points, based on his "own personal knowledge," ECF

No. 18-1 at 3 ¶ 1, are not "superficial," as Mr. McGuire asserts. ECF No. 26 at 1. This court

finds that the evidence introduced here is "sufficient to support a finding that the witness has

personal knowledge of the matter," Fed. R. Evid. 602, as many other courts have found when

faced with nearly identical circumstances. *See, e.g.*, *Hanson v. Experian Info. Sols. Inc.*, No.

1:23-CV-4564-MHC-CMS, 2024 WL 2974160, at *3 (N.D. Ga. June 12, 2024) ("When

presented with arbitration agreements in contracts formed online between Experian and

consumers, courts routinely have relied on declaration testimony like that provided by [Dan]

Smith in this case to demonstrate how the consumer manifested assent to the company's

arbitration provision.") (collecting cases), *report and recommendation adopted*, 2024 WL

3509482 (N.D. Ga. July 22, 2024); *Johnson*, 2023 WL 1944127, at *5 (upholding use of

declaration of David Williams); *Salazar v. Experian Info. Sols., Inc.*, No. 4:22-cv-00598-HFS,

2023 WL 3529635, at *5 (W.D. Mo. May 15, 2023) (same); *Pecoraro v. Synovus Bank*, No. 23-

cv-80780-Rosenberg, 2024 WL 167391, at *1 (S.D. Fla. Jan. 16, 2024) ("The Williams Affidavit

is competent evidence to show that Plaintiff accepted the Terms of Service Agreements—and the

relevant arbitration clause—that were in effect when he enrolled in CreditWorks. Mr. Williams

had personal knowledge of the contents of the Terms of Service Agreements at the time of

Plaintiff's enrollment, and every enrollee had to accept those terms before using the software.").

Mr. McGuire argues in opposition that this court should be guided by *Austin v. Equifax Servs., LLC*, No. 3:22cv707, 2023 WL 8646275 (E.D. Va. Dec. 14, 2023), *appeal filed*, No. 23-2301 (4th Cir. Dec. 21, 2023). *See* ECF No. 26-1 at 2-3. In *Austin*, EIS moved to compel arbitration, relying on the declaration of David Williams, the Vice President of Business Governance for CIC. *See* 2023 WL 8646275, at *2. The court excluded Mr. Williams's declaration, finding that his job description did not clearly explain the basis for his purported personal knowledge: "Nothing in Williams' job description disclosed personal knowledge of how the system at issue works." *Id.* at *7. Neither, in *Austin*, did Mr. Williams identify the documents on which he based his assertion of personal knowledge. *Id.* at *4.[9]

Not so here. Mr. Smith has provided detailed information about his job duties and his personal familiarity with the CreditWorks enrollment process—down to a level of granularity as to which webpages a consumer would encounter to complete their enrollment and which links or buttons the consumer would necessarily have clicked on. ECF No. 18-1 at 2-3 ¶¶ 3-4. Indeed, Mr. Smith is "able to retrieve a consumer's CreditWorks membership information," from which he can "confirm the consumer's membership details, such as the date and time of enrollment, the version of the Terms of Use they agreed to, and *the exact path the consumer encountered* when completing their enrollment into CreditWorks." ECF No. 18-1 at 2 ¶ 1 (emphasis added).

On the basis of these facts—concerning which Mr. McGuire raises no genuine dispute—this court finds that Mr. Smith "has the requisite personal knowledge to attest to the statements

---

[9] Notwithstanding the generally straightforward nature of the question presented in a motion to compel arbitration, the trial court proceedings in *Austin* appear to have been complex and messy. *See* 2023 WL 8646275, at *3 (discussing a lengthy arbitration-discovery process and numerous discovery disputes); *see also* ECF No. 36 at 11-13 (describing same).

set forth in his declaration." *Hanson*, 2024 WL 2974160, at *4 (finding same with respect to a

declaration Mr. Smith provided in that case). The situation here is thus distinguishable matter

from *Austin*, which this court is not obliged to follow and which appears to be an outlier in any

event. *See, e.g.*, *Baker v. Experian Info. Sols., Inc.*, No. 1:24-cv-00605-TWP-MJD, 2024 WL

3082644, at *2 (S.D. Ind. June 20, 2024) (observing, in relying on Dan Smith's declaration, that

plaintiff's reliance on *Austin* "proves weak," because *Austin* is on appeal and the Fourth Circuit

recognizes that "affidavits submitted by corporate representatives . . . are properly considered

when the corporate representative expressly verifies that the matters stated therein are based on

his own personal knowledge gained through review of business records") (quotation omitted);

*Williams v. Experian Info. Sols., Inc.*, No. CV-23-01076-PHX-DWL, 2024 WL 739676, at *4

(D. Ariz. Feb. 23, 2024) (rejecting plaintiff's reliance on *Austin* in finding that "[t]he Court

cannot ignore that many courts, including the Ninth Circuit, have granted requests by Defendant

to compel arbitration under what appears to be the same agreement") (citing *Meeks v. Experian

Info. Sols, Inc.*, Nos. 21-17023, 22-15028, 2022 WL 17958634 (9th Cir. Dec. 27, 2022));

*Scribner v. Trans Union LLC*, No. 2:23-cv-02722-JAM-CKD, --- F. Supp. 3d ---, 2024 WL

3274838, at *3 (E.D. Cal. July 2, 2024) (noting that "Plaintiff has also not provided legal

authority . . . requiring [Dan] Smith to specifically identify every document on which he may

have relied," and finding that "Plaintiff's reliance on *Austin* . . ., an unpublished decision from

the Eastern District of Virginia that is currently on appeal, is unavailing").

Finally, Mr. McGuire makes a passing reference to hearsay, *see* ECF No. 26 at 5

(referring to hearsay in connection with the Williams declaration in *Austin*), suggesting that Mr.

Smith's declaration and the attached exhibits constitute inadmissible hearsay. Assuming, without deciding, that these materials are in fact hearsay, their exclusion from the record is not required.

"[A]lthough affidavits are permissible in <u>form</u>, the <u>content or substance</u> of the affidavit must be otherwise admissible, and any hearsay contained in a summary judgment affidavit remains hearsay, beyond the bounds of the court's consideration." *Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1272 (10th Cir. 2021) (internal quotation marks and citation omitted, emphasis in original). The same is true of the documents attached to such affidavits. *See, e.g.*, *id*. at 1273 (discussing *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016)).

Pursuant to Federal Rule of Evidence 801, hearsay is defined as any statement that "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Hearsay testimony is generally inadmissible." *Archer v. Griswold*, 638 F. Supp. 3d 1246, 1254 (D. Colo. 2022) (quotation omitted). "[T]he proponent of hearsay evidence bears the burden of establishing the applicability of a hearsay exception[.]" *United States v. Irvin*, 682 F.3d 1254, 1262 (10th Cir. 2012).

Evidence that would otherwise be inadmissible as hearsay is admissible under the business records exception if the following conditions are met: the records were (A) made around the time of the events at issue, (B) kept in the course of a regularly conducted business activity, and (C) made as a regular practice of that activity. *See* Fed. R. Evid. 803(6)(A)-(C). These requirements for admitting the evidence must be "shown by the testimony of the custodian or another qualified witness[.]" Fed. R. Evid. 803(6)(D). The witness is not himself required to have detailed personal information about the records system in order to provide this testimony.

*See United States v. Penn*, No. 20-cr-00152-PAB, 2021 WL 4943647, at *3 (D. Colo. Oct. 22, 2021) (rejecting argument that a records custodian can only testify as to documents he or she has first-hand knowledge of) (citing *In re Kim*, 809 F. App'x 527, 540 (10th Cir. 2020) ("[T]he 'custodian or other qualified witness need not have personal knowledge regarding the creation of the document offered, or personally participate in its creation, or even know who actually recorded the information.'") (quotation omitted)).

Here, Mr. Smith, who has worked for CIC for fourteen years, has testified as to each of the conditions necessary to invoke the business-records exception. Mr. Smith states in his declaration that he is qualified to testify about CIC's business records because his "duties at CIC include supporting the consumer enrollment process into CreditWorks, and related services," and that these obligations require him to be familiar with "how consumers enroll, the forms they must complete to enroll, . . . [and] the Terms of Use governing such services"—as well as "Experian's databases that store consumer enrollment" and "consumer account information[.]" ECF No. 18-1 at 2 ¶ 1. He avers that he is "familiar with Experian's internal records that document consumers' ongoing use of their CreditWorks account, including when a consumer logs into their account or changes their account information[.]" *Id.* He has reviewed "CIC's membership enrollment data maintained in the regular course of business," which enabled him to verify that Mr. McGuire enrolled in CreditWorks on December 27, 2022. *Id.* at 3 ¶ 3.

This information, including information about Mr. "Smith's position with CIC, the nature of his job duties, his familiarity with the CreditWorks enrollment process, and the information and records available to him," *see Hanson*, 2024 WL 2974160, at *5, is sufficient to show that he is qualified to offer his declaration and to meet the conditions under Federal Rule of Evidence

803(6)(A)-(D). On the other side, Mr. McGuire has *not* "show[n] that the source of information

or the method or circumstances of preparation indicate a lack of trustworthiness." *Id.* 803(6)(E).

This court therefore properly considers the declaration, and the attached exhibits, in evaluating

EIS's Motion to Compel Arbitration. *See Hancock*, 701 F.3d at 1264.

> **B.     Enforceable Agreement to Arbitrate**

With this preliminary evidentiary matter disposed of, the court turns to the substantive

question of whether there exists an enforceable agreement to arbitrate. EIS argues that Mr.

McGuire is contractually bound to arbitrate the claims he raises against EIS in this lawsuit. ECF

No. 18 at 14-19. This court agrees.

The court looks to precedent in this Circuit that has routinely enforced internet

agreements where, as here, the user is required to affirmatively acknowledge the agreement

before proceeding to use a website. The Tenth Circuit has specifically found that such "a

clickwrap agreement"[10] is valid and enforceable. *Hancock*, 701 F.3d at 1256 (recognizing that

"[c]lickwrap agreements are increasingly common and have routinely been upheld") (quotation

omitted). Many cases in this District have followed suit. "Courts have held that clicking 'accept'

to the terms of a clickwrap agreement, even when the terms do not appear on the same screen as

the 'accept' button but are available with the use of a hyperlink, is sufficient to form a contract."

*Nichols*, 2023 WL 5938917, at *3 (citing *Vernon*, 857 F. Supp. 2d at 1150-51; *Hancock*, 701

F.3d at 1257-58; and *Health Grades, Inc. v. Hamot Med. Cent.*, No. 05-cv-02163-REB-MEH,

2006 WL 8454634, at *3 (D. Colo. Feb. 27, 2006) (finding clickwrap agreement binding and

---

[10] "Clickwrap" agreements are of the type at issue here, which present the consumer with terms
and conditions and a mechanism for assenting to those terms. *Vernon*, 857 F. Supp. 3d at 1149.

collecting cases from other jurisdictions finding the same)); *see also, e.g.*, *Petrie*, 360 F. Supp. 3d at 1161 (observing that, "[w]ith respect to internet arbitration agreements, courts 'routinely' uphold such agreements provided the user had 'reasonable notice, either actual or constructive, of the terms of the putative agreement and . . . manifested assent to those terms") (quoting *Vernon*, 857 F. Supp. 2d at 1149).

Here, as described above, the evidence demonstrates that Mr. McGuire manifested his assent to the Arbitration Agreement. His act of clicking on the purple "Create Your Account" button signified his acceptance of the Terms of Use Agreement, including the Arbitration Agreement contained therein. Mr. McGuire was explicitly informed that, by clicking on the purple button, he was agreeing to the Terms of Use Agreement, which could be easily accessed by means of a blue-highlighted hyperlink on the same webpage as the Create Your Account button. The Arbitration Agreement itself is presented in straightforward language in easily readable print of the same size as all other terms in the Terms of Use Agreement; nothing is hidden or obscured to the reader who desires to review its contents. *See Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1030 (D. Colo. 2012) (terms in a click-wrap agreement must be "sufficiently conspicuous as to permit a reasonable user the opportunity to review them and either agree to them or to cancel the . . . service").

From this record it is apparent that Mr. McGuire had clear notice of the Terms of Use Agreement and the entirety of its contents, which he was required to affirmatively acknowledge with his enrollment. His clicking on the "Create your Account" button, indicating his acceptance of the click-wrap agreement, is sufficient to form a contract—as many other courts have concluded in reviewing the specific CreditWorks sign-up process at issue here. *See, e.g.*, *McLees*

*v. Experian Info. Sols., Inc.*, No. 2:23-cv-04580-SPG-KS, 2024 WL 135940, at *3 (C.D. Cal.

Jan. 11, 2024); *Abukar v. Experian Info. Sols., Inc.*, No. 22-cv-0855-bhl, 2023 WL 3394827, at

*2 (E.D. Wis. April 11, 2023); *Arciniega v. Experian Info. Sols., Inc.*, No. CV-23-00245-PHX-

SPL, 2023 WL 6803084, at *3 (D. Ariz. Oct. 12, 2023); *Cimillo v. Experian Info. Sols., Inc.*, No.

21 CV 9132 (VB), 2023 WL 2473403, at *7 (S.D.N.Y. Mar. 13, 2023); *see also* ECF No. 36 at

5-6 (collecting additional cases finding the same). Notably, the version of the Arbitration

Agreement in effect when Mr. McGuire filed this lawsuit specifically and conspicuously

apprised him of the requirement to arbitrate disputes arising under the FCRA. ECF No. 18-1 at

47.

Mr. McGuire offers no law, or supporting evidence, that mandates a different conclusion.

He points to *Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016), ECF No. 26 at 15 &

*passim*, but that case is factually distinguishable from his own. What "cinche[d] the case" for the

plaintiff in *Sgouros* was the fact that nothing in the clickwrap-agreement process advised the

plaintiff that he was assenting to a contract:

> But what cinches the case for Sgouros is the fact that TransUnion's site actively
> misleads the customer. The block of bold text below the scroll box told the user that
> clicking on the box constituted his authorization for TransUnion to obtain his
> personal information. *It says nothing about contractual terms*. No reasonable
> person would think that hidden within that disclosure was also the message that the
> same click constituted acceptance of the Service Agreement.

*Id.* at 1035 (emphasis added). Here, by contrast, the webpage for the CreditWorks sign-up

process specifically advised Mr. McGuire of his assent to a contract: "**By clicking 'Create Your**

**Account,' I accept and agree to your <u>Terms of Use Agreement</u>, as well as acknowledge**

**receipt of your <u>Privacy Policy</u>.**" ECF No. 18-1 at 7 (underlining indicating blue hyperlinks in

original; emphasis added). And it appears that all courts that have evaluated the CreditWorks

enrollment process (with the exception of *Austin*, which is pending appeal) have found no

subterfuge or lack of clarity in that process. As one court very recently summarized the core

point:

> Here, in between where Hanson entered his personal information and where he
> clicked the "Create Your Account" button, the webform stated in bold letters, set
> off from other paragraphs, "By clicking 'Create Your Account': I accept and agree
> to your Terms of Use Agreement." The words "Terms of Use Agreement" are
> further off-set in blue text. The webpage itself is uncluttered, and the hyperlink is
> both temporally and spatially coupled with the mechanism for manifesting assent—
> i.e., the register button. Thus, a reasonable smartphone user would know that more
> information would be found if he clicked upon the hyperlink.

*Hanson*, 2024 WL 3509482, at *11 (cleaned up; internal citations omitted).

Mr. McGuire claims that he "never encountered" the Arbitration Agreement prior to this

litigation, and that he has "no recollection" of the Terms of Use, ECF No. 26-1 ¶¶ 7-9, but these

contentions raise no genuine dispute about the existence of a valid and enforceable agreement to

arbitrate. First, these assertions are belied by a clear record demonstrating Mr. McGuire's

affirmative assent to the Arbitration Agreement in his clicking the "Create Your Account" button

and his subsequently not opting out of that Agreement. Second, if Mr. McGuire's point is that he

did not read the Terms of Use Agreement—despite having multiple opportunities to do so—that

decision does not suffice to invalidate his agreement. Under Colorado law, Mr. McGuire "cannot

avoid contractual obligations by claiming that he . . . did not read the agreement." *Vernon*, 857 F.

Supp. 2d at 1152 (quoting *Loden v. Drake*, 881 P.2d 467, 469 (Colo. App. 1994)). And it is

obvious that this should be so, lest all contracts be subject to invalidation at the whim of a

dissatisfied party. *See, e.g.*, *Martinez v. Capstone Restaurant Grp., LLC*, No. 20-cv-01017, 2021

WL 1723776, at *3 (D. Colo. Mar. 31, 2021) ("Plaintiff's failure to recall executing the arbitration agreement does not raise a genuine dispute of material fact as to the existence of the agreement[.]"); *Petrie*, 360 F. Supp. 3d at 1162 ("[G]eneral denials and statements that a user does not recall visiting a website or agreeing to arbitrate are insufficient to defeat arbitration.").

The Arbitration Agreement is valid and enforceable.

## C.    Enforcement of the Arbitration Agreement by EIS

The next issue for the court to address is whether EIS may enforce the Arbitration Agreement. For the reasons that follow, the court concludes that it can.

EIS argues that its authority to enforce the Arbitration Agreement stems from its status as a party to the Agreement. EIS claims party status because it is defined as an "affiliate" of ECS under the Terms of Use Agreement. *See* ECF No. 18 at 16-17; *see also* ECF No. 18-1 at 14 ("For purposes of this arbitration provision, references to 'ECS,' 'you,' and 'us' shall include our respective parent entities, subsidiaries, affiliates (including, without limitation, our service providers) . . ."); Ex. 3, ECF No. 18-1 at 45 ("The term 'ECS' means . . . [its] affiliates (including, but not limited to, Experian Information Solutions, Inc.)"). As Mr. Smith declares, EIS has been an affiliate of ECS during the entire time Mr. McGuire has been enrolled in CreditWorks. *Id.* at 4, ¶ 6. The evidence further shows that, during that time, EIS has played a significant role in providing services under the Terms of Use. Specifically, it has "contributed to the services that CreditWorks subscribers receive by providing regular access to how information appears in their EIS credit files, including changes to their credit information." *Id.* at 5, ¶ 8 (further stating that, pursuant to the Terms of Use, EIS provides credit information, including "credit report(s), credit risk score(s), credit monitoring, credit score monitoring and credit score

tracking (including all the data and information contained therein), [and] the receipt of any alerts

notifying consumers of changes to the information contained in their credit reports(s)") (quoting

*id.* at 45) (cleaned up).

This undisputed evidence provides ample support for the conclusion that EIS is a party to

the Arbitration Agreement and may directly enforce it, as courts routinely have found. In

reviewing the same Arbitration Agreement in the same Terms of Use Agreement as that at issue

here, the Ninth Circuit drilled down on the essential point:

> The text of the arbitration provision binds plaintiffs to arbitrate with ECS and
> defines ECS to include 'affiliates,' and Experian is an affiliate and was so when the
> plaintiffs entered into the agreement. That Experian was an affiliate at the time the
> contract was formed and that it plays a role in the larger agreement provide
> additional evidence that it assented to be bound and was not a mere third-party
> beneficiary.

*Meeks*, 2022 WL 17958634, at *2 (concluding that, "[b]ecause the district court's denial of the

motion to compel arbitration was the result of a legal error and the record is sufficiently

developed to allow us to do so, we hold that Experian is a party to the arbitration provision")

(internal citations omitted); *see also, e.g.*, *Capps v. JPMorgan Chase Bank, N.A.*, No. 2:22-cv-

806-DAD-JDP, 2023 WL 3030990, at *5 (E.D. Cal. Apr. 21, 2023) (observing that "[m]ultiple

district courts have reached the same conclusion" that the Arbitration Agreement in the Terms of

Use at issue here compels arbitration with EIS) (collecting cases); *Alvarez v. Experian Info.*

*Sols., Inc.*, 661 F. Supp. 3d 18, 27 (E.D.N.Y. 2023) (upon review of the same Terms of Use,

including the Arbitration Agreement, concluding that "[t]here is no reasonable basis to find that

Plaintiff has not assented to arbitration with Experian").

This court finds no justification for reaching a contrary conclusion here, and Mr.

McGuire has identified none. The evidence presented by EIS is sufficient to establish that it has

been an affiliate of ECS during the entire time that Mr. McGuire has been enrolled in

CreditWorks and that it is a party to the Arbitration Agreement. The Arbitration Agreement

therefore binds Mr. McGuire to arbitrate with EIS.[11]

### D.      Delegation of Arbitrability

Having concluded that there is a valid agreement to arbitrate between the parties, the

court proceeds to consider whether the FCRA dispute here is within the scope of claims the

parties agreed to arbitrate. First, though—as with the CarMax Arbitration Provision—the court

must resolve the gateway question of arbitrability, i.e., whether particular claims fall within the

ambit of the Arbitration Agreement. That question admits of a straightforward answer in light of

the explicit, and broad, delegation clause in the Arbitration Agreement:

> **All issues are for the arbitrator to decide** including, but not limited to, (i) **all issues regarding arbitrability**, (ii) **the scope and enforceability of this arbitration provision** as well as the Agreement's other terms and conditions, (iii) whether you or ECS, through litigation conduct or otherwise, waived the right to arbitrate, (iv) whether all or any part of this arbitration provision or Agreement is unenforceable, void or voidable including, but not limited to, on grounds of unconscionability, (v) any dispute regarding the payment of arbitration-related fees, (vi) any dispute related to the dispute Notice provisions in subparagraph (b) (above), and (vii) any dispute related to Mass Arbitration (defined below). **Pursuant to this agreement, the arbitrator has been delegated with, and possesses, exclusive authority to resolve all of the above-enumerated types of disputes**.

ECF No. 18-1 at 47 (Terms of Use Agreement in effect when McGuire filed suit) (emphasis

---

[11] Because the court concludes that EIS may enforce the Arbitration Agreement as a party, it does not take up EIS's alternative argument that it is a third-party beneficiary to the Agreement. ECF No. 18 at 17-19.

added); *see also id.* at 15 ("*All issues are for the arbitrator to decide*, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement . . .") (Terms of Use Agreement in effect when McGuire enrolled in CreditWorks) (emphasis added).

In this provision, the parties have unequivocally manifested their intent to delegate issues of arbitrability to the arbitrator. The court therefore finds that any question of whether Mr. McGuire's FCRA claims are encompassed within the Arbitration Agreement must be decided by the arbitrator. *Henry Schein*, 586 U.S. at 68 (where the question of arbitrability has been validly delegated to the arbitrator a "court possesses no power to decide the arbitrability issue[,] . . . even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.").[12] The court's analysis of the arbitrability question perforce ends here.

*    *    *

Because EIS and Mr. McGuire have a valid Arbitration Agreement, Mr. McGuire's dispute against EIS must be submitted to arbitration. This court therefore respectfully **RECOMMENDS** that EIS's Motion to Compel Arbitration be granted.

## IV.    Administrative Closure

Having determined that the claims against CarMax and EIS must proceed to arbitration, and because both entities have requested a stay pending the completion of those proceedings, the court must concurrently recommend that the case be stayed. *See* 9 U.S.C. § 3; *cf. Smith v.*

---

[12] Because EIS has not alternatively addressed whether the FCRA claims would be within the scope of the Arbitration Agreement, this court also does not analyze that question.

*Spizzirri*, 601 U.S. 472, 475-76 (2024) ("When a federal court finds that a dispute is subject to arbitration, and a party has requested a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss the suit on the basis that all the claims are subject to arbitration."). With that determination, the court must also choose between a stay and administrative closure of this action, which the Tenth Circuit has construed to be "the practical equivalent of a stay." *Quinn v. CGR*, 828 F.2d 1463, 1465 n.2 (10th Cir. 1987).

In evaluating the choice between a stay and administrative closure, the court begins by recognizing that it is uncertain when the arbitration proceedings will be completed. Administrative closure is a particularly suitable mechanism to employ "when a case would otherwise be stayed for an indefinite amount of time." *Talmadge v. Berkley Nat'l Ins. Co.*, 687 F. Supp. 3d 1089, 1094 (D. Colo. 2023) (citing *Garcia v. State Farm Mut. Fire & Cas. Co.*, No. 20-cv-02480-PAB-MEH, 2021 WL 4439792, at *6 (D. Colo. 2021)); *see also Hartford Life & Accident Ins. Co. v. Nickal*, No. 17-cv-02556-MSK-MJW, 2018 WL 1173150, at *1 (D. Colo. Mar. 6, 2018) (finding administrative closure appropriate because it was unclear when a parallel criminal proceeding would be adjudicated). Under these circumstances, this court finds that administrative closure pursuant to D.C.COLO.LCivR 41.2, pending the completion of the two arbitrations, is the more appropriate course. *Id.* ("A district judge or a magistrate judge exercising consent jurisdiction may order the clerk to close a civil action administratively subject to reopening for good cause.").

In so finding, the court must resolve a related issue—one which neither CarMax nor EIS addresses head-on—regarding the scope of the administrative closure and whether it ought to apply to Defendant Equifax, who has answered the complaint and who does not claim to be a

party to an arbitration agreement with Mr. McGuire. *See* ECF No. 19 at 3 (noting that "CarMax takes no position on whether the stay would apply broadly to the entire case, including the other two defendants"); ECF No. 14 at 1 (stating that Equifax has represented that it does not oppose a stay of this action).[13] On the one hand, the FAA allows for concurrent litigation when some issues are arbitrable. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). On the other, where, as here, some but not all parties' claims are subject to arbitration, the Supreme Court has left it to the discretion of the district court to stay or proceed with litigation on the non-arbitrable claims. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20 n.23 (recognizing that, "[i]n some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration," and leaving that decision to the district court "as a matter of its discretion to control its docket") (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)).

Here, the court begins its discretionary analysis by recognizing that Mr. McGuire is suing EIS and Equifax—who are among the "three predominant consumer [credit] reporting agencies," *see* ECF No. 1 ¶ 2—for alleged violations of the FCRA. *Id.* ¶¶ 114-129 (Counts I and II brought against both EIS and Equifax). To be sure, each of these entities took some independent actions with regard to Mr. McGuire. But it is also clear from the complaint that his claims hinge on EIS's and Equifax's similar responses to his report that the CarMax "charge-off," which both entities reported and refused to correct, was erroneous. *Id.* ¶ 38 ("Experian and Equifax, in mid-January 2023, dealt a blow by verifying the erroneous charge-off."); *id.* ¶ 39 ("the responses

---

[13] No party, including Mr. McGuire, has suggested that the case against Equifax should continue while the other claims are being arbitrated.

from both [Equifax and Experian] remained unchanged, continuing to uphold the incorrect

charge-off"). The question of liability of both EIS or Equifax thus turns on substantially the same

actions, evaluated pursuant to the same legal theory. Under these circumstances, it may be that

the arbitrator's determination as to EIS will have some preclusive effect as to Mr. McGuire's

claims against Equifax. The Tenth Circuit has applied collateral estoppel to an arbitration award.

*Coffey v. Dean Witter Reynolds Inc.*, 961 F.2d 922, 927 & n.4 (10th Cir. 1992) ("The doctrine of

collateral estoppel . . . bars relitigation of legal or factual issues that have previously been

decided through arbitration."); *see also Adams v. FedEx Ground Package Sys., Inc.*, 546 F.

App'x 772, 777 (10th Cir. 2013) (affirming application of collateral estoppel to an arbitrating

plaintiff); *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005) ("As for finality, a

valid and final award by arbitration generally has the same effect under the rules of res judicata

as a judgment of a court."). The issue of claim preclusion can be addressed by this court, if

appropriate, upon the conclusion of the arbitration proceedings.

The undersigned therefore finds that administrative closure of the entire case, as against

all Defendants, is appropriate., and respectfully **RECOMMENDS** that this action be

**administratively closed** in its entirety, as to all parties, pursuant to Local Rule 41.2. This closure

will allow the parties to resolve the claims in the arbitration proceedings and to give Mr.

McGuire an opportunity to determine whether he wishes to pursue further litigation in this court

on his claims against Equifax.

### CONCLUSION

For the foregoing reasons, this court respectfully **RECOMMENDS** that the Motions to

Compel Arbitration (ECF Nos. 14, 18) be **granted** and that the case be **administratively closed**

in accordance with D.C.COLO.LCivR 41.2. The court further **RECOMMENDS** that the

administrative closure encompass all parties and all claims in this lawsuit, and that the parties be

advised that the court will not find good cause to reopen this matter while the arbitrations

involving Plaintiff and Defendant CarMax, and Plaintiff and Defendant EIS, are pending.[14]

DATED: August 16, 2024                          BY THE COURT:

_____

Susan Prose
United States Magistrate Judge

---

[14] Rule 72 of the Federal Rules of Civil Procedure provides that within fourteen (14) days after
service of a Magistrate Judge's order or recommendation, any party may serve and file written
objections with the Clerk of the United States District Court for the District of Colorado. 28
U.S.C. §§ 636(b)(1)(A), (B); Fed. R. Civ. P. 72(a), (b). Failure to make any such objection will
result in a waiver of the right to appeal the Magistrate Judge's order or recommendation. *See
Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 782 (10th Cir. 2021) (firm waiver
rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1119,
1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require
review, including when a "pro se litigant has not been informed of the time period for objecting
and the consequences of failing to object").